United States District Court
Southern District of Texas
**ENTERED**
December 09, 2015
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ROBERT DANIEL KEYS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-350 |
| | § | |
| CANDACE TORRES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff Robert Daniel Keyes is suing certain employees of the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) for prospective injunctive relief, as well as nominal and punitive damages, alleging that Defendants violated his First Amendment and due process rights when they denied him receipt of certain publications through the mail. Pending is Defendants' motion for summary judgment to dismiss Plaintiff's claims for failure to state a constitutional violation, failure to exhaust administrative remedies as to two Defendants, and qualified immunity. (D.E. 140-141). Plaintiff has filed a response in opposition. (D.E. 151-152).

For the reasons stated herein, it is respectfully recommended that Defendants' motion for summary judgment be granted, and that Plaintiff's claims against Defendants be dismissed with prejudice.

## I.      JURISDICTION.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.     PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the TDCJ-CID and is currently housed at the McConnell Unit (MCU) in Beeville, Texas.  Plaintiff is suing numerous MCU mailroom officials, as well as TDCJ-CID officials involved in interpreting mail room policy, alleging that they violated his First Amendment rights based on the following actions:

In January 2012, Defendants Officer Torres and Mailroom Supervisor Collins denied Plaintiff receipt of a magazine titled *Shotgun News* on the grounds that it could constitute an offense of "breakdown of a weapon" under TDCJ-CID policy BP 03.91. Plaintiff checked the policy and argued that it prohibited only information regarding the *manufacture* of explosives, weapons or drug.  However, despite Plaintiff's interpretation of BP 03.91, the Mailroom System Coordinator's Panel (MSCP) upheld the McConnell Unit's denial of this magazine, as did the Director's Review Committee (DRC) in Huntsville, Texas.

Thereafter, from January through October 2012, Plaintiff was denied every subsequent issue of *Shotgun News*.  In addition, Plaintiff was denied a book he ordered titled *U.S. Army Special Forces Handbook*, as well as the June and September 2012 issues of *Gun Digest*.  Prison officials also seized his *Rand McNally Road Atlas* and a *NASCAR Road Atlas* in December 2010.  Plaintiff asked to appear before the MSCP and

the DRC to defend his receipt of the publications, but he was denied the opportunity to do so.

On November 13, 2012, Plaintiff filed his original complaint alleging that Defendants violated his First Amendment rights by prohibiting him from receiving his gun magazines and books.  (D.E. 1 at 4, 9 -13).  Plaintiff named as Defendants: (1) Officer Kandis Torres; (2) Kisha Collins, mailroom supervisor; (3) John and Jane Does on the MSCP; (4) John and Jane Does on the DRC; and (5) the TDCJ-CID.[1]  In addition to his First Amendment claim. Plaintiff argued that the confiscation of his books and magazines constituted "theft by deception," and that the TDCJ-CID's option to have the banned material sent home was cost prohibitive.   Plaintiff claimed further that Defendants committed fraud because BP 03.91 permits an inmate to receive these publications, but Defendants deny them.  Finally Plaintiff alleged that his due process rights were violated because he was not permitted to argue his position before the MSCP or the DRC.

On January 24, 2013, the undersigned United States magistrate judge recommended that Plaintiff's claims be dismissed for failure to state a claim and/or as frivolous (D.E. 11), to which Plaintiff timely filed objections.  (D.E. 13).

On May 21, 2013, the Court adopted in part, and denied in part, the recommendation.  (D.E. 14).  The Court adopted the recommendation and dismissed for failure to state a claim Plaintiff's due process and breach of TDCJ-CID policy claims.

---

[1] Plaintiff identified Defendant Kandis Torres as "Candace Torres" and Kisha Collins as "Keisha Collins."  The corrected spelling is based on Defendants' Answer and subsequent pleadings.

However, the Court declined to adopt the dismissal of Plaintiff's First Amendment claims against Defendants.

On July 2, 2013, service was ordered on the following Defendants:  Officer Kandis Torres, Supervisor Kisha Collins, MSCP Doe Defendants and DRC Doe Defendants.  (D.E. 16).

On August 15, 2014, Officer Torres and Supervisor Collins filed their Answer. (D.E.19).  In addition, on behalf of the MSCP and DRC Doe Defendants, Ms. Jennifer Smith filed an Answer to Plaintiff's complaint.  Ms. Smith is both the supervisor of the MSCP as well as a DRC member, and therefore, Ms. Smith is the appropriate party to answer Plaintiff's claims against the MSCP and the DRC.  (D.E. 19).

On September 16, 2013, Plaintiff filed an objection to the Defendants' alleged failure to provide the names of the individual members on the MSCP and DRC.  (D.E. 23).

On September 20, 2013, Defendants responded to Plaintiff's objection and maintained that Defendant Smith was the only proper defendant to address Plaintiff's claims against the MSCP and DRC.  (D.E. 26).  Defendants stated:

> … Defendant Smith is both the supervisor of the Mailroom System Coordinators Panel and the member of the Director's Review Committee responsible for reviewing and affirming all denials of magazines to offenders.  This defendant is therefore ultimately and exclusively responsible for the alleged constitutional violations pled.

(D.E. 26, p. 1).

Plaintiff filed a first and second motion seeking leave to amend his complaint (D.E. 41, 51), and on January 9, 2014, a supplemental order for service of process was entered naming as additional Defendants in this lawsuit: (1) Warden Carol Monroe; (2) former Warden Richard Crites; and (3) former Mailroom Supervisor David Diaz.  (D.E. 52).

On February 10, 2014, Warden Monroe filed his Answer.  (D.E. 61).  On that same day, the Texas Attorney General (AG) advised the Court that Defendant Crites and Defendant Diaz no longer work for the TDCJ-CID, and the AG was granted leave to file the last known addresses of these Defendants under seal.  (*See* D.E. 62, 63, 64).

Defendants Crites and Diaz were served (D.E. 75, 76), and on March 31, 2014, they filed their Answer to Plaintiff's second amended complaint.  (D.E. 78).

On June 30, 2014, Plaintiff filed a motion for leave to file an amended complaint arguing that his claims had been misconstrued.  (D.E. 90).  On July 3, 2014, Defendants filed a response supporting Plaintiff's motion for leave to file an amended complaint noting that Plaintiff's prior pleadings lacked clarity and were difficult to comprehend. (D.E. 93).  On July 25, 2014, Plaintiff filed his third amended complaint against all Defendants.   (D.E. 97).   Plaintiff specifically identified the following nine (9) Defendants:

(1)    Texas Board of Criminal Justice;
(2)    Director's Review Committee;
(3)    Mailroom System Coordinator's Panel;
(4)    Ms. Jennifer Smith;
(5)    Warden Carol Monroe;
(6)    Kisha Collins, Mailroom Supervisor;
(7)    Candace Torres, correctional officer;

(8)    Richard Crites, former McConnell Unit Warden; and
(9)    David Diaz, former Mailroom Supervisor.

(D.E. 97, pp. 1-21).  Plaintiff also stated in his amended complaint: "**THERE ARE NO FURTHER DEFENDANTS TO THIS CIVIL ACTION"**.  (D.E. 97, p. 21) (emphasis in original).

On August 28, 2014, Defendants filed their Amended Answer to Plaintiff's third amended complaint.  (D.E. 99).  On that same date, the State Agency Defendants (TBCJ, MSCP, and DRC), filed a Rule 12(b)(1)/12(b)(6) motion to dismiss Plaintiff's claims against them (D.E. 100), and the Doe Defendants filed a motion to dismiss as well.  (D.E. 101).  Plaintiff filed objections to the dismissal of those Defendants.  (D.E. 102, 103).

On October 10, 2014, the undersigned entered a recommendation that the Court dismiss the State Agency and John and Jane Doe Defendants.  (D.E. 105).  However, it was recommended that the Court retain Plaintiff's First Amendment claims for money damages against Smith, Collins, Torres, Monroe, Diaz and Crites, while any claims for monetary damages against these individuals in their official capacities be dismissed as barred by the Eleventh Amendment.  *Id.*  On January 12, 2015, the Court adopted the October 10, 2014 recommendation.  (D.E. 108).

On January 16, 2015, the remaining Defendants filed a motion to dismiss Plaintiff's claims for nominal and punitive claims on the grounds that he had failed to plead for such damages originally and was now barred from doing so.  (D.E. 109, 116).

On January 28, 2015, Plaintiff filed a motion to add William Stephens, the Director of the TDCJ-CID, suing him in his official capacity only for injunctive relief.

(D.E. 110).  Plaintiff was granted leave to do so (D.E.121), and service was ordered on Director Stephens.

On May 11, 2015, it was recommended that Defendants' motion to dismiss Plaintiff's claims for nominal and punitive damages be denied, and also that his claims for injunctive relief against all Defendants, including the newly added William Stephens, be retained.  (D.E. 131).  On September 15, 2015, the Court adopted the recommendation and denied Defendants' motion to dismiss.  (D.E. 1500).

On July 10, 2015, Defendants filed the instant motion for summary judgment. (D.E. 140-141).

On September 25, 2015, Plaintiff filed his response in opposition to defendants' summary judgment motion.  (D.E. 151-152).

*Current Posture of Case.*

Thus, the claims before the Court are as follows:

(1)     Nominal and punitive damages against Defendants Smith, Collins, Torres, Monroe, Crites and Diaz in their individual capacities;

(2)     Injunctive relief against Defendants Smith, Collins, Torres, Monroe, Crites and Diaz to the extent they are still employed by the TDCJ-CID; and

(3)     Injunctive relief against Defendant Stephens in his official capacity.

## III.   SUMMARY JUDGMENT EVIDENCE.

Defendants move for summary judgment on the following grounds: (1) Plaintiff failed to exhaust his confiscation of maps claim against Defendants Crites and Diaz; (2) Plaintiff has failed to establish any violation of the First Amendment based on the enactment or enforcement of BP 03.91; and (3) Plaintiff has failed to overcome

Defendants' entitlement to qualified immunity.  In support of their motion for summary judgment, Defendants offers the following:

Ex. A:  Affidavit of Kelli Ward, custodian of Offender Grievance Records, testifying that attached grievance records for offender Robert Keys are true and correct (D.E. 140-2, p. 2);

Ex. B:  Copies of Grievance Nos. 2011065367, 2011066096, and 2011069492 (D.E. 140-3, pp. 2-16);

Ex. C:  Copy of Grievance No. 2014025209 (D.E. 140-4, pp. 2-7);

Ex. D:  MSCP/DRC records regarding Plaintiff (D.E. 140-5, pp 2-5);

Ex. E:  Copy of Grievance No. 2012189776 (D.E. 140-6, pp. 2-9);

Ex. F:  Copy of Grievance No. 2012196095 (D.E. 140-7, pp. 2-9);

Ex. G:  TDCJ Board policy 03.91 (D.E. 140-8, pp. 3-15);

Ex. H:  July 6, 2015 edition of *Shotgun News* (D.E. 140-9, p. 1)*; and*

Ex. I:  Affidavit of Jeremy LaRue, TDCJ Security Operations Warehouse Manager (D.E. 140-10, pp. 2-4).

In addition to his 124 page response, Plaintiff offers 417 pages of exhibits.  (*See* D.E. 150-152).  Many of the exhibits are duplicative of Defendants' exhibits, and in those cases, reference will be made to Defendants' exhibits for convenience.  Reference to Plaintiff's exhibits will be to docket entry and page number.

The facts of this case are presented through Plaintiff's grievances:

Prior to the July 2012 confiscation of his *Shotgun News* magazine, in December 2010, Plaintiff filed three Step 1 grievances complaining that on December 2, 2010, he was wrongfully charged with a disciplinary case for attempted escape based on an anonymous I-60 tip, following which his cell was search and much of his personal

property was seized, including numerous maps.  (*See* Grievance No. 2011065367, D.E. 140-3, pp. 2-3, returned unprocessed as inappropriate; Grievance No. 2011066096, D.E. 140-3, pp. 4-5, returned unprocessed as inappropriate because prisoner cannot ask for punitive damages; and Grievance No. 20101069492, D.E. 140-3, pp. 6-7, denied following investigation that property was returned and signed for on 12/13/10).  Plaintiff did not file a Step 2 appeal as to any of the three December 2010 grievances complaining about the confiscation of his property, including the maps, and an investigation determined that his maps were returned to him.  (*See* D.E. 140-3, p. 11, Offender Property Inventory forms signed by Plaintiff on December 13, 2010).

On July 2, 2012, Plaintiff filed a Step 1 grievance, Grievance No. 2012189776, complaining about the confiscation of his S*hotgun News* publication.  (D.E. 140-6, pp. 2-3).  Plaintiff noted that he had been receiving *Shotgun News* without incident since December 2011, but now, since Mr. Diaz had left, the mailroom was "enforcing their own interpretation of Board Policy 03.91" in violation of his constitutional rights.  (D.E. 140-6, p. 2).  Warden Monroe responded that the DRC was currently reviewing the magazine at issue and would have the final decision on whether or not it was appropriate.  (D.E. 140-6, p. 3).  Plaintiff filed a Step 2 appeal of Grievance No. 2012189776 that was denied.  (D.E. 140-6, pp. 4-5).  The Region IV grievance investigator noted:

> The Mail Systems Coordinators Panel (MSCP) is responsible for the review of publication intended for offender receipt.  Publications containing the breakdown or the manufacturer of weapons will be denied in accordance with Board Policy 03.91.

(D.E. 140-6, p. 5).

On July 13, 2012, Plaintiff filed a Step 1 grievance, Grievance No. 2012196095, complaining that on July 2, 2012, the mailroom had rejected a book or magazine pursuant to BP 03.91, and this was the eighth time this year it had happened. (D.E. 140-7, pp. 2-3). Plaintiff stated that he had complained to Defendants Torres and Collins, but received no relief, and complained further that defendants would not let him examine the material being withheld. (D.E. 140-7, p. 2). Warden Monroe denied the grievance, responding: "Whenever a publication is denied you may not see what is being denied. A description of the reason for the denial is clearly stated on the denial form. You may only appeal this decision if the DRC has not already made a ruling." (D.E. 140-7, p. 3).

Plaintiff filed a Step 2 appeal of Grievance No. 2012196095 arguing that Warden Monroe's response was a "non-answer." (D.E. 140-7, pp. 4-5). The Region IV grievance investigator quoted BP 03.91 responding:

> Board Policy 03.91 states in part, "the offender will be given a sufficiently detailed description of the rejected publication to permit effective utilization of the appeal procedures." Offenders are not allowed to view denied material. No further action is warranted.

(D.E. 140-7, p. 5).

On October 13, 2013, Plaintiff filed a Step 1 grievance, Grievance No. 2014025209, complaining about the incident in December 2010 when he was placed in segregation and charged with attempted escape and his property, including maps, confiscated, based on an anonymous I-60 tip. (D.E. 140-4, pp. 2-7). Plaintiff complained that on September 21, and October 7, 2013, he sent I-60s to Lieutenant Mireles stating:

> On December 5, 2011, I was locked up in 11 building under investigation by an anonymous I-60 in regards to having two United States Road Atlases

and a number of state tourism and National Geographic country maps that I used as writers' location guides. None had maps of Texas. Those maps were seized by this unit despite being approved and signed "Accepted" by the Carol Young Infirmary Unit and by the C.T. Terrell Unit that Texas had been removed by them per policy at those Units. I am aware that Assistant Warden R. Crites was the senior member of the McConnell Unit's MSCP Panel at the time. Mr. Diaz was the mailroom supervisor at this time and he also sat on the MSCP panel for this unit. Which of the two, or was it a MSCP Panel decision conforming to BP 03.91 that required these maps be seized and destroyed?

(D.E. 140-4, p. 2).

By response dated January 2, 2014, Plaintiff was advised:

…Investigation reveals that there is no evidence to support your allegation of staff misconduct by Lieutenant Mireles. Lieutenant Mireles has no recollection of any maps being confiscated due to the date of confiscation being in December 2011. Furthermore, a review of your grievance history shows that you filed a grievance in regards to the issue stated on this grievance, the grievance was processed according to policy and found no merit to your claim. If you were not satisfied with your response you could have filed a Step 2 appeal. No further action is warranted.

(D.E. 140-4, p. 3). Plaintiff did not file a Step 2 appeal of Grievance No. 2014025209.

## IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on

file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be

granted." *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact.  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.   DISCUSSION.

### A.   Failure to exhaust claims as to Defendants Crites and Diaz.

Defendant Crites and Diaz move for summary judgment to dismiss Plaintiff's claims against them for failure to exhaust, alleging that Plaintiff failed to file grievances as to their conduct regarding the confiscation of maps in December 2010.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U. S. C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v.*

*Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).   A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court.  *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).  Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints.  *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam).  The Fifth Circuit requires that both steps be completed in order to file suit in federal court.  *Johnson v. Johnson*, 385 F.3d 503, 515-16 (5th Cir. 2004).[2]

Plaintiff filed three grievances in 2010 challenging the confiscation of his maps. (*See* D.E. 140-3, pp. 2-16).  He failed to file a Step 2 grievance as to any map-related claim, and therefore, those claims are not exhausted.  *Johnson,* 385 F.3d at 515-16.  In addition, the maps were only confiscated temporarily as part of an investigation into a potential escape, and were then returned to Plaintiff.  (D.E. 140-3, p. 11).

After filing this lawsuit, Plaintiff raised his map claims again two years later in Grievance No. 2014025209.  (D.E. 140-4, pp. 2-7).  Plaintiff complained that he had sent Lieutenant Mireles two I-60s about the events in December 2010, yet he had not received an answer to his inquiry regarding who had made the decision to seize the maps in

---

[2] Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident.  *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has ten days to appeal by filing a Step 2 grievance, which is handled at the state level.  *Id.*

December 2010. (D.E. 140-4, p. 2).  Lieutenant Mireles, who is not a defendant in this action, did not recall the December 2010 events, and Plaintiff's grievance was denied. He did not file a Step 2 appeal of that grievance.

According to his Amended Complaint, Plaintiff's only claim against Defendant Crites and Defendant Diaz involves "his National Geographic, State tourism and Rand-McNally/NASCAR United States Road maps."  (*See* D.E. 97, p. 17-21).  The undisputed evidence shows that Plaintiff has never successfully exhausted his administrative remedies with regards to his map claims because he never filed a Step 2 appeal. Accordingly, Defendants Crites and Diaz are entitled to summary judgment in their favor and it is respectfully recommended that Plaintiff's claims against them be dismissed for failure to exhaust.

In his summary judgment response, Plaintiff argues that Defendants statements are "false," and he cites to authority excusing exhaustion where prison officials have interfered with the grievance process.  (*See* D.E. 151, p. 8).  Plaintiff raises a previous discovery dispute and argues that, in response to his interrogatories to Defendants concerning the disposition of his grievances, Defendants refused to answer.  (D.E. 151, p. 9).  He suggests that there was a Step 2 appeal of Grievance No. 2011069492, but he has no information that it was ever "filed."  *Id.*  He claims that, because he does not know if his Step 2 appeal to Grievance No. 2011069492 regarding the maps was ever filed, it was necessary for him to file the October 13, 2013 grievance against Lieutenant Mireles, Grievance No. 2014025209, in an attempt to discover who made the decision about his maps.  However, filing a grievance *two years later*, allegedly to determine the answer to a

Step 2 appeal that Plaintiff cannot say for certain was even filed, is too tenuous an argument to refute the summary judgment evidence that Plaintiff simply did not exhaust his maps claims.[3]  If he filed a Step 2 appeal of Grievance No. 2011069492 challenging the confiscation of his maps, he should have a copy of the grievance, or a date it was filed, or a follow-up inquiry about the appeal or, at a minimum, be willing to testify that he *filed* or *submitted* the grievance, but then never received a response.   However, Plaintiff carefully selects his words to place the burden on Defendants to tell him if a Step 2 appeal was filed, making his accusations against Defendants suspect.   In addition, the fact that Defendants did not produce copies of Plaintiff's grievances in discovery is of no import because Plaintiff would have already possessed this evidence.

Plaintiff's argument fails to raise a genuine issue of material fact for purposes of summary judgment, and Crites and Diaz are entitled to summary judgment in their favor because Plaintiff failed to exhaust his map claims.   Moreover, as discussed below, even if Plaintiff had exhausted his claims, Defendants are entitled to summary judgment in their favor because Plaintiff's allegations fail to state a cognizable constitutional violation, and, even if he did state a cognizable claim, Defendants are entitled to qualified immunity.

---

[3] Plaintiff also raises the issue of limitations.  (*See* D.E. 151, pp. 10-14).  Defendants have not moved for summary judgment on this ground.

### B.      Constitutionality of BP 03.91.

Plaintiff objects to Defendants' seizure of his gun magazines and books pursuant to BP 03.91.  He claims that BP 03.91 is in violation of the First Amendment and his due process rights.

### (1)      First Amendment.

"[A] prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner….'"  *Turner v. Safely,* 482 U.S. 78, 95 (1987) (quoting *Pell v. Procunier,* 417 U.S. 817, 822 (1974).  Accordingly, prisoners and their correspondents enjoy the protections of the first amendment except to the extent that prison regulations curtailing those protections are "reasonably related to legitimate penological interests."  *Thornburgh v. Abbott,* 490 U.S. 401, 404 (1989) (quoting *Turner,* 482 U.S. at 89).  In assessing the "reasonableness" of a prison regulation that infringes on First Amendment interests, a court must consider four factors: (1) whether the regulation is "rationally related" to a legitimate penological goal; (2) whether alternative means of exercising First Amendment rights remain open; (3) the impact that accommodating the asserted right will have on other prisoners and prison employees; and (4) whether there are easy and obvious alternative means of accommodating the asserted right.   *Id.* at 414-18.  "[R]ationality is the controlling factor," *Mayfield v. Tex. Dep't of Criminal Justice,* 529 F.3d 599, 607 (5th Cir. 2008), and the remaining factors are best understood as indicators of rationality.  *See Scott v. Miss. Dep't of Corr.,* 961 F.2d 77, 80-81 (5th Cir. 1992).

The Supreme Court has also instructed that it is "important to inquire whether prison regulations restricting inmates' First Amendment rights operate in a neutral

fashion." *Thornburgh,* 490 U.S. at 415 (quoting *Turner,* 482 U.S. at 90). This neutrality requirement means that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Id.* (quoting *Procunier v. Martinez,* 416 U.S. 396, 413 (1974). Prison regulations that "draw distinctions between publications solely on the basis of their potential implications for prison security" are facially neutral in the relevant sense. *Id.* at 415-16.

The Fifth Circuit had the opportunity to examine a First Amendment challenge to BP 03.91 in *Prison Legal News v. Livingston,* 683 F.3d 201 (5th Cir. 2012). Prison Legal News (PLN), a non-profit corporation that distributes books to prisons, challenged the TDCJ's application of BP 03.91 in censoring five titles. *Prison Legal News,* 683 F.3d at 206. The challenged policy, BP 03.91, is titled "Uniform Offender Correspondence Rules," and it sets forth the following grounds on which a publication may be rejected:

(a)   It contains contraband that cannot be removed;

(b)   It contains information regarding the manufacture of explosives, weapons, or drugs;

(c)   It contains material that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of prison through offender disruption such as strikes, riots, or STG [Security Threat Group] activity;

(d)   A specific determination has been made that the publication is detrimental to offenders' rehabilitation because it would encourage deviant criminal sexual behavior;

(e)   It contains material on the setting up and operation of criminal schemes or how to avoid detection of criminal schemes by lawful authorities charged with the responsibility for detecting such illegal activity; or

(f)   It contains sexually explicit images.

18 / 30

(BP 03.91, D.E. 140-8, pp. 12-13).

The procedures for applying BP 03.91 were detailed in *Prison Legal News*.  In reviewing incoming mail, if mailroom staff finds content that is objectionable in a publication, they deny the publication without reviewing the remaining content or attempting to weigh the objectionable content against the permissible content.  *Prison News*, 683 F.3d at 208.  The reason the publication was denied, as well as citations to specific pages, is recorded in the TDCJ database.  *Id.*  Mailroom employees receive training and supervision on BP 03.91 from the MSCP.  *Id.*  The MSCP attempts to provide guidance to mail room staff in complying with the First Amendment.  *Id.*

When a publication is initially denied by mailroom staff, the TDCJ sends a written notice to the prisoner and the publication's sender stating that (1) the publication was denied for content, (2) identifies the page(s) containing the objectionable content and the reason it is objectionable, and (3) explains how to appeal the mailroom's decision.  An appeal of a publication is sent to the DRC, a body of TDCJ administrators.  *Prison News*, 683 F.3d at 208.  The DRC typically delegates the appeal to a member of the MSCP.  *Id.* A single MSCP member reviews the publication, and will either approve or deny it, and that decision is final.  *Id.*  If an MSCP member is uncertain whether the publication should be denied, a second MSCP member reviews the publication.  *Id.*  If the two MSCP members do not agree, the publication is referred to the DRC as a whole for final review. *Id.*  Like the mailroom employee, the MSCP/DRC "do[es] not attempt to determine

whether the remainder of the [publication] contains other content which is not in violation of policy or which would 'outweigh' [the objectionable content]." *Id.*

During this appeals process, the MSCP/DRC reviews only the denial form and the publication itself in reaching its decision. *Prison News,* 683 F.3d at 208. The prisoner or publication sender has no formal opportunity to participate in the appeals process, either at a hearing or by submitting written arguments. *Id.* Essentially, the right to appeal is only the right to request additional review from the TDCJ. *Id.* The DRC sends the prisoner written notice of the decision. *Id.* An approved publication is delivered to the inmate. *Id.* The appeal and its result are recorded in the TDCJ database. *Id.* A list of newly approved and denied publications is posted in each unit's law library to inform prisoners of decisions from the current and previous month. *Id.*

In *Prison News,* the PLN argued, *inter alia*, that BP 03.91 violated the First Amendment. *Prison News*, 683 F.3d at 214-221. The Fifth Circuit first examined the reasonableness of the specific exclusion decision behind each censored book. Two books were excluded as depicting scenes of rape. MSRP member Jennifer Smith, a defendant in this lawsuit, testified that such descriptions constitute a threat to prison safety and security because prisoners could use the descriptions and templates to commit similar rapes. *Id.* at 216. A third book was excluded because it contained racial slurs and "advocates the overthrow of prisons by riot and revolt." *Id.* A forth book was censored because it recounted the sexual molestation of a young child, and Ms. Smith and another official testified that such material could impair the rehabilitation of sex offenders or cause disruptive outburst by prisoners who were similarly victimized. *Id.* at 217. The

fifth book was censored because it contained racial slurs and included descriptions of racial tensions in prisons. *Id.* Ms. Smith testified that books describing racial tensions present a threat of violence because of the existence of race-based prison gangs and the prevalence of racial discord in TDCJ prisons. *Id.* The Fifth Circuit found the TDCJ's censorship of these five books all "rationally related" to the TDCJ's legitimate penological interest in security and that the PLN had failed to refute these findings.

In this case, Plaintiff was denied magazines and books that contained a discussion of the assembly and/or disassembly of certain weapons. (D.E. 97). Defendants maintain that exclusion of this material is rationally related to the legitimate penological interest of security, and in support thereof, offer the affidavit of Jeremy LaRue, the TDCJ Security Operations Warehouse Manager. (D.E. 140-10, LaRue Aff't at ¶ 1). Mr. LaRue testifies:

> …I understand that this lawsuit arises from a denial by TDCJ officials of offender access to a periodical publication called *Shotgun News.* I understand that the denial is made pursuant to TDCJ Board Policy 03.91. I understand that the specific portion of the publication found objectionable is an advertisement depicting a diagram of an M16/AR15 rifle broken down into component parts. …
>
> During my review of *Shotgun News,* I discovered that every issue of the publication is replete with material that offenders should not have access to. The publication contains vast amounts of technical diagrams, detailed photographs, and detailed instructions on the assembly, fabrication, and amateur conversion of many types of firearms. The publication also contains specifications, measurements and loading instructions for creation of a wide variety of ammunition. Additionally, each issue contains advertisements featuring photos and descriptions of devices and methods for concealing weapons and other contraband.
>
> Armed with the information contained in a given issue of *Shotgun News,* it is my opinion that an offender, even one with only a rudimentary knowledge of firearms – could pose a serious threat to the safety and security of a TDCJ facility. Tools and materials which might be accessed

to fabricate weapons based on this information can be found in a variety of locations, to include maintenance departments, craft shops, and Texas Correctional Industries.

(D.E. 140-10, LaRue Aff't at ¶¶ 3, 5-6).

Defendants have offered uncontroverted summary judgment evidence that the specific exclusion of *Shotgun News* was rationally related to a legitimate penoligical interest in maintaining TDCJ security.  Like the PLN, Plaintiff has failed to meet his burden of establishing that the regulation is not rationally related to a legitimate penological interest or is an "exaggerated response" to the magazine.  Thus, Defendants satisfy the first *Turner* factor.

As for the other *Turner* factors, the Fifth Circuit found in *Prison News* that Board Policy 03.91 satisfies the remaining criteria to pass constitutional scrutiny.  The second factor is alternative means of exercising the right.  The *Prison News* Court found this factor weighed heavily in the TDCJ favor because prisoners and the PLN had ample alternatives for exercising their First Amendment speech rights beyond the exclusion of those five books.  *Prison News,* 683 F.3d at 218.  Indeed, the Fifth Circuit noted that in *Turner,* "this factor counted in the government's favor where the regulation forbidding all inmate-to-inmate correspondence did not 'deprive prisoners of *all means of expression*. Rather, it barred communication only with a limited class of other people.'" *Id.*  Similarly, in *Thornburgh,* the Supreme Court held that this factor was "clearly satisfied" because the challenged regulation, which gave federal prison wardens discretion to censor publications for content-based reasons, "permitted a broad range of publications to be sent, received, and read." *Thornburgh,* 490 U.S. at 418.

As in *Prison News,* BP Policy 03.91 leaves open "ample alternative avenues" for Plaintiff to pursue his interest in firearms and weapons, as long as that interest does not include the manufacture of weapons, which necessarily implies assembly and disassembly.  (BP 03.91, D.E. 140-8, p. 12).  Plaintiff has failed to refute Mr. LaRue's testimony that diagrams and discussions detailing the breakdown of a weapon would pose a threat to prison security.   The alternatives left open to Plaintiff, to get other weapon/gun/shooting magazines or even develop countless other interests, satisfies *Turner.*   Thus, the second factor strongly indicates that the TDCJ's practices are reasonable.

The third factor to be addressed in the First Amendment analysis under *Turner* is what will be the impact of the accommodation of the asserted constitutional right on others (guards and prisoners).  *Prison News,* 683 F.3d at 219 (citing *Turner,* 482 U.S. at 418).  As the Supreme Court explained in *Thornburgh:* Where "the class of publications to be excluded is limited to those found detrimental to order and security … [and] [w]here … the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and prisoners alike, the courts should defer to the 'informed discretion of corrections officials.'" *Thornburgh,* 490 U.S. at 417-18. In general, because BP 03.91 is reasonably connected to order and security, this factor is satisfied.  *Prison News,* 683 F.3d at 219.

The fourth *Turner* factor is the existence of obvious, easy alternatives to the challenged regulation may be evidence that the regulation is not reasonable.  *Turner,* 482 U.S. at 90-91.   However, Plaintiff has not even suggested an alternative way of

accomplishing the same penological objectives promoted by BP 03.91; he merely argues that it would be impossible to manufacture a weapon from the parts culled together at a prison.  Mr. LaRue, an expert in security, squarely refutes this assertion.  This factor weighs in favor of Defendants.

An analysis of Plaintiff's claims in light of *Turner* and its progeny demonstrate that Defendants' denial of *Shotgun News* and other books depicting the assembling or breakdown of a weapon were properly censored pursuant to BP 03.091 and BP 03.91 does not violate the First Amendment.

**(2)    Due Process.**

Plaintiff claims that application of BP 03.91 denies him his due process rights because: (1) he is not allowed to view the banned material; (2) the entire magazine is censored rather than just the objectionable parts removed; and (3) he is denied an independent appeal because Defendants can sit on both the DRC and the MSRP.

"The touchstone of due process is protection of the individual against arbitrary action of government."  *Wolff v. McDonnell,* 418 U.S. 539, 557 (19740 (citing *Dent v. West Virginia,* 129 U.S. 114, 123 (1889)).  With respect to due process rights, *Turner* cited to *Wolff.  See Turner,* 482 U.S. at 84.  Under *Wolff,* the amount of due process to be accorded is commensurate with the deprivation involved, keeping in mind the need to arrive at a reasonable accommodation between the interests of inmates and the needs of the institution.  Due process rights exist only to protect substantive interests.  *McFaul v. Valenzuela,* 684 F.3d 564, 579 (5th Cir. 2012 (rejecting "free-standing" due process claims).  The Supreme Court has consistently held that "some kind of hearing" is

required at some time before a person is finally deprived of his property interests. *Wolff,* 418 U.S. at 557-58.

Even when a substantial liberty interest is at issue, due process within the prison system can be limited to notice and an opportunity to be heard, with a requirement of a written decision that memorializes the reasons for the action taken. *Wolff,* 418 U.S. at 557-58. The Supreme Court considered that the requirements of a written record would ensure that decision-makers would be as fair as possible. *Id.* at 565. *Wolff* does not address any administrative appeal process as a constitutional requirement. Rather, the concern is that the decisions not be arbitrary. *Id.*

Plaintiff claims that BP 03.91 is unconstitutional because it denies him the opportunity to review the rejected publication; instead, he only receives a description. There is no authority allowing for a prisoner to preview censored material and this Court has found that including such a requirement would "defeat the policy [03.91] and encourage inmates to order materials they know will be denied, simply to get that one viewing." *See Rodriguez v. Bell*, Civil Action No. 2:14-cv-447, 2015 WL 3756509, *4 (S.D. Tex. Jun. 16, 2015). This allegation fails to state a due process claim.

Plaintiff next objects to the fact that the entire magazine is censored rather than just the objectionable portion removed and the remainder delivered to him. The Supreme Court has rejected this administratively burdensome, content-altering, and property destroying alternative. *Thornburgh*, 490 U.S. at 419.

Plaintiff objects to the BP 03.91 appeal process. He argues that Jennifer Smith was part of the initial denial as well as the DRC appeal decision such that he was denied

any meaningful independent review.  This argument is based on *Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir. 1978), in which the Fifth Circuit held that a "[p]risoner must, of course, be allowed to appeal [a denial] decision through proper administrative channels." More specifically, the Fifth Circuit explained that "[a]n inmate receives sufficient review of the administration's decision not to permit [correspondence] if he (1) receives appropriate notice, (2) a reasonable opportunity to challenge the initial decision, and (3) an ultimate decision by a *disinterested party not privy to the initial censorship decision."* *Guajardo*, 580 F.2d at 762 n. 10 (emphasis added).  However, *Turner* called *Guajardo* into question with the emphasis on deference to prison administrators, and the requirement under *Wolff* is simply that the decision not be arbitrary. *See Rodriquez*, 2015 WL 3756509 at *3.

BP 03.91 includes an appeal process.  (D.E. 140-8, p. 15).  However, BP 03.91 reveals that the TDCJ places an emphasis on uniformity in the interpretation and application of the rules.  Concerns for uniformity do not mandate independent review and, in some cases, may counsel against complete independence.  Importantly, Plaintiff does not claim that Ms. Smith or any other defendant had an impermissible interest in the initial decision to deny him *Shotgun News.*

Further, Plaintiff's complaint that one disinterested individual may have been involved in some capacity in both levels of the TDCJ decision-making does not state a cognizable claim.  *See Rodriquez*, 2015 WL 3756509 at *3.

Plaintiff fails to establish that application of BP 03.91 or the actions of Defendants in regards to Plaintiff's receipt of *Shotgun News* or other books that depicted how to

assemble and disassemble a weapon violated Plaintiff's due process rights, and therefore, it is respectfully recommended that Defendants be granted summary judgment in their favor as to Plaintiff's due process claims and that those claims be dismissed with prejudice.

### C.    Qualified Immunity.

Defendants have asserted their right to qualified immunity to the extent Plaintiff is suing them in their individual capacities for monetary damages.   The Fifth Circuit recognizes qualified immunity as an important shield for government officials:

> A state official exercising discretionary authority whose conduct deprives another of a right secured by federal constitutional or statutory law is nonetheless shielded from personal liability for damages under Section 1983 by the doctrine of qualified immunity, unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on which the suit is founded.

*Dudley v. Angel,* 209 F.3d 460, 462 (5th Cir. 2000).

Defendants are presumptively entitled to qualified immunity, and it is Plaintiff's burden to overcome this presumption.  *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir. 1992); *see also McClendon v. City of Columbia,* 305 F.3d 314, 323   (5th Cir. 2002).

To overcome Defendants' immunity, Plaintiff must (1) state a claim for a violation of a constitutional right; (2) show that the constitutional right was established at the time of the actions at issue; and (3) demonstrate that Defendants' conduct was objectively unreasonable in light of the legal rules clearly established at the time of their actions. *Thomas v. City of Dallas,* 175 F.3d 358, 364 (5th Cir. 1999).  Plaintiff may not satisfy

these requirements with conclusory allegations of wrongdoing. *Geter v. Fortenberry,* 849 F.2d 1550, 1553 (5th Cir. 1988).

A court required to rule upon the qualified immunity issue should consider the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (The Court is free to independently analyze and rule on either element of the qualified immunity analysis pursuant to *Pearson v. Callahan*, 555 U.S. 223 (2009)). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiry into the issue of qualified immunity. *Saucier*, 533 U.S. at 201.

Even if this Court were to find a violation of Plaintiff's constitutional rights, this is not enough to overcome Defendants' qualified immunity. The Court must also determine whether Defendants' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Saucier*, 533 U.S. at 201. In order for the law to be classified as "clearly established," the case law must draw a bright line: "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what Defendant is doing violates federal law in the circumstances." *Sorenson v. Ferrie,* 134 F.3d 325, 328, 330 (5th Cir. 1998).

Even if an official's conduct violated a clearly established constitutional right, the Court still must determine whether Defendants' actions were objectively unreasonable in light of the law as it existed at the time the conduct occurred and in light of the

information that they possessed.  *Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *see also Valencia v. Wiggins,* 981 F.2d 1440, 1448 (5th Cir. 1993).  "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Additionally, if reasonable public officials could differ on the lawfulness of Defendants' actions, Defendants are entitled to qualified immunity.  *Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997).

In denying Plaintiff *Shotgun News* and other materials concerning weapons, Defendants were following the guidelines set forth in BP 03.91.  It was reasonable for prison employees and officials to act in a manner consistent with organizational policy that would have been generated with assistance of legal counsel and prison executives.  Plaintiff offers no evidence to suggest that any Defendant acted with malice, bias, or in an arbitrary manner as it concerns his receipt of publications.  Defendants are entitled to qualified immunity and to summary judgment in their favor.

## VI.   RECOMMENDATION.

BP 03.91 has been determined to pass constitutional scrutiny under *Turner,* thus defeating any First Amendment challenge, and Plaintiff's alleged due process claims against application of the policy have also been considered and rejected.  *See Prison Legal News*, 683 F.3d 201 (2012), *Rodriguez v. Bell,* 2015 WL 3756509 (S.D. Tex. Jun. 16, 2012).  Moreover, even if Plaintiff had alleged a valid constitutional violation, Defendants would be entitled to qualified immunity because a reasonable prison official

applying BP 03.91 would conclude that material on how to assemble or disassemble a weapon would threaten the security of the prison and would justifiably be censored. According, there is no genuine issue of a material fact and it is respectfully recommended that Defendants' motion for summary judgment (D.E. 140), be granted, and that Plaintiff's claims against Defendants be dismissed with prejudice,

Respectfully submitted this 9th day of December, 2015.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).